# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**FRANK SHELDON**
        **Plaintiff,**

     **v.**                            **Case No. 13-C-1219**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
               **Defendant.**

## DECISION AND ORDER

Plaintiff Frank Sheldon suffers from a somatoform disorder – "a mental illness that can cause bodily symptoms, such as pain, without any physical cause." Thompson v. Colvin, 575 Fed. Appx. 668, 671 (7th Cir. 2014); see also Sims v. Barnhart, 442 F.3d 536, 537 (7th Cir. 2006) ("The term 'somatoform disorder' refers to what used to be called 'psychosomatic' illness: one has physical symptoms, but there is no physical cause. This is a well-attested phenomenon."). The Seventh Circuit has noted that this disorder presents particular challenges for the Social Security Administration ("SSA") in adjudicating applications for disability benefits, for pain attributable to a psychiatric condition cannot be verified by scans or tests, thus allowing a claimant to exaggerate his symptoms without fear of contradiction by objective medical evidence. Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004). The agency must carefully evaluate credibility in these cases with an understanding of the disorder, factoring in any limitations on work capacity caused by pain of psychological origin. Because the agency failed to do so in this case, the matter must be remanded for further proceedings.

# I. FACTS AND BACKGROUND

## A.      Medical Evidence

The record contains limited medical evidence, much of it coming from consultants engaged by the agency to evaluate plaintiff's claim.  Treatment records are sparse.

On March 20, 1996, plaintiff was admitted to the hospital complaining of severe abdominal pain accompanied by nausea.  He was given intravenous fluids and taken to surgery, with exploration revealing a perforated sigmoid diverticulitis (inflammation in the lower part of the colon).[1]  (Tr. at 271.)  Dr. Anilkumar Singh performed a laparatomy with sigmoid resection and colostomy[2] (Tr. at 269), which plaintiff tolerated well (Tr. at 270), discharging home on March 26 on a regular diet and with Percocet for pain (Tr. at 271).  On May 20, 1996, Dr. Singh performed a takedown of the colostomy with coloproctostomy;[3] plaintiff discharged home on May 26 on a soft diet, with a prescription for Percocet and a limitation on heavy lifting. (Tr. at 273.)

Hospital notes indicate that plaintiff was seen for an unspecified kidney disorder, rib fracture, esophogeal reflux, seasonal allergies, "single kidney,"[4] anxiety, and diverticulitis of the colon in 2007 and 2008.  (Tr. at 274.)  On July 31, 2009, plaintiff saw Dr. Maryann Gilligan for

---

[1]See http://digestive.niddk.nih.gov/ddiseases/pubs/diverticulosis/.

[2]A colostomy is a surgical procedure that brings one end of the large intestine out through an opening (called a stoma) made in the abdominal wall, with stools moving through the intestine draining through the stoma into a bag attached to the abdomen. http://www.nlm.nih.gov/medlineplus/ency/article/002942.htm.

[3]A coloproctostomy involves the establishment of a communication between the rectum and a discontinuous segment of the colon.  Stedman's Medical Dictionary 382 (27th ed. 2000).

[4]Later records report a congenital absence of the left kidney.  (Tr. at 291.)

an annual follow-up, reporting a difficult time with allergies. He reported taking Alka Selzer cold plus before sleep and worried about taking anything that might mess up his single kidney. He also reported a painful lesion on his left hand. (Tr. at 312.) Dr. Gilligan assessed seasonal allergies (Tr. at 313), prescribing Singulair; a painful wart-like lesion on the left thumb, providing a referral to the hand clinic for removal; GERD, well-controlled on Pantoprazole;[5] history of diverticulitis, with persistent loose stools managed with Loperamide (a medication used to control diarrhea)[6] and a high fiber diet; single kidney, avoiding nephrotic agents; and anxiety with sleep problems, continuing Oxazepam (an anti-anxiety medication)[7] as needed. (Tr. at 314.)

On October 12, 2009, plaintiff saw Dr. Eugene Pruitt complaining of genital discomfort, specifically, pain in his penis; he denied any testicular discomfort but did mention a mass in the scrotum. On exam, Dr. Pruitt noted that plaintiff had a strange affect and somatic thought content. Examination of the genital area was essentially normal, aside from an extra-testicular mass in the left scrotum. (Tr. at 311.) Dr. Pruit assessed genital discomfort of unclear etiology, expressing concern that there might be some degree of somatization in plaintiff's complaints. Dr. Pruitt prescribed Ciprofloxacin, an antibiotic, and advised plaintiff to return for follow up. (Tr. at 312.) When he came back later that month, plaintiff denied any improvement with the antibiotics, and Dr. Pruitt concluded that the problem was "most likely psychological in nature."

---

[5]Pantoprazole is used to treat gastroesophageal reflux disease ("GERD"), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html.

[6]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682280.html.

[7]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682050.html.

(Tr. at 310.) Dr. Pruitt reassured plaintiff that there was nothing pathological about his exam, and that he should not be overly concerned. Dr. Pruitt concluded: "Patient might need psychological testing to ascertain if he has a somatoform disorder." (Tr. at 311.)

On December 1, 2009, plaintiff went to the hospital complaining of testicular pain (Tr. at 287), and a scrotal ultrasound revealed an epididymal cyst, mildly increased in size from a previous scan done in June 2008 (Tr. at 278-79, 289). Doctors provided Vicodin for pain and advised him to contact the urology department for follow up. (Tr. at 281, 320.) On December 3, plaintiff presented at the urology clinic, indicating that he had seen a Dr. Larson for removal of fatty tumors in his chest and arms, but Dr. Larson did not attempt to remove the lump in his scrotum. Plaintiff complained that he had been having pain in the area for some time, which was getting worse. He had been given Vicodin but presented for further management, requesting excision of the scrotal cyst if possible. (Tr. at 300.) The doctor noted, "it is very difficult for me to examine him because of his extreme pain." (Tr. at 302.) Plaintiff was scheduled for surgery on December 8. (Tr. at 303.)

On December 8, 2009, plaintiff underwent a left epididymectomy (Tr. at 299), displaying "a significant amount of pain from just the IV placement." (Tr. at 300.) Doctors indicated that he could return to work on light duty on December 14, resuming full activity on December 21. (Tr. at 300.) Plaintiff returned to the hospital on December 10, complaining of severe post-operative scrotal pain, not under control with Percocet. He was noted to be "in pain, shouting" (Tr. at 296), but exam was largely normal, aside from post-operative swelling, and a repeat ultrasound revealed no evidence of any abscess or significant hematoma (Tr. at 293, 294). Doctors discontinued Percocet and started plaintiff on Ibuprofen with acetaminophen, using Oxycodone for break-through pain as needed, and admitted him for a 23 hour observation. (Tr.

4

at 293, 298-99.) On December 14, plaintiff returned as an outpatient, with his pain under better control. Exam was essentially normal, with some left testis post-operative swelling. (Tr. at 291, 292.)

On January 17, 2011, after plaintiff filed his application for disability benefits, the agency set up a consultative examination with Abdul Hafeez, M.D. Plaintiff reported low back pain since 1983 when he slipped and fell on some ice. He indicated that his back went out six to eight times per year, and each time it took three to four weeks to get better. He applied heat and rested during these episodes but did not take any medications. He also complained of leg pain and heaviness due to varicose veins, and hand and shoulder pain for about 10 years. He further reported knee pain for many years, indicating that his knees locked and got stiff after sitting for 15 minutes. He reported difficulty walking 10 to 15 blocks. (Tr. at 329.) His current medications were over the counter Imodium and Prilosec. On physical exam, he appeared in pain with difficulty getting up and walking. (Tr. at 330.) He displayed sensitivity all around the abdomen, not wanting Dr. Hafeez to touch the area around his surgical scar. Examination of the extremities was mostly unremarkable, with good range of motion and normal motor function. His did show tenderness of the shoulders, with some complaint of pain on movement. He also displayed tenderness in the right lumbosacral area, but straight leg raise was negative, and he only complained of knee pain when doing the straight leg testing. He would not bend more than 80 degrees because he was screaming in pain, and he actually also screamed with light touching of the stomach and shoulders. He had no swelling around the knees and showed good range of motion, but he again screamed in pain when flexion of the knee was done. He did have some very mild varicose veins in the front of the leg just above and below

the knee.  Dr. Hafeez checked the tender spots for fibromyalgia, with negative results.[8]  (Tr. at 331.)

Dr. Hafeez assessed low back pain, which appeared to be localized muscular pain without radiation, numbness, or other problems related to the legs.  Plaintiff's gait did not appear to be very good, however his varicose veins were minimal and did not appear to be a significant problem.  His hands showed no deformity, with full range of motion and good grip.  His shoulders were tender, but he showed good range of movement.  His knees also showed good range of movement, without any deformity or swelling, and he walked without use of a cane.  (Tr. at 332.)  X-rays of the knees were negative.  (Tr. at 333.)  On January 21, 2011, Mina Khorshidi, M.D., evaluated the record for the agency, finding plaintiff capable of light work with occasional kneeling, crouching, and crawling.  (Tr. at 100-01.)

On June 28, 2011, Mark Pushkash, Ph.D., conducted a mental status examination for the agency.  (Tr. at 249, 336.)  Plaintiff told Dr. Pushkash: "I'm falling apart.  I have a lot of medical problems.  They don't know what's wrong with me, but I can't work anymore."  (Tr. at 336.)  He reported chronic pain throughout his body, including back problems, knee pain, and difficulty using his hands for grasping and writing.  (Tr. at 336.)  He indicated that over the last two years everything had gotten worse.  He had no primary care doctor due to lack of money or insurance.  He took no prescribed medications, but used over the counter Imodium and Prevacid.  Regarding mental health treatment, he reported receiving a prescription for Xanax

---

[8]Fibromyalgia is a rheumatic condition characterized by pain all over, fatigue, disturbed sleep, stiffness, and multiple tender spots – "more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).

in the 1990s when going through a divorce; otherwise, he had received no mental health treatment and never been hospitalized for psychiatric care. He reported living alone and independently in an apartment, supporting himself through unemployment, but it recently ran out. He did take care of basic domestic chores such as cooking, cleaning, shopping, and laundry, although he reported it was getting harder to do so. (Tr. at 337.)

Dr. Pushkash noted that plaintiff walked with a very slow gait and displayed pain behaviors throughout the assessment. He sat on the edge of his chair in a somewhat tense fashion and tended to shift positions during the interview. Eye contact was adequate, and overall level of motor activity generally within normal limits. (Tr. at 337.) He was reasonably cooperative. (Tr. at 337-38.) Dr. Pushkash observed no obvious problems with fine motor manipulation or grasping, although plaintiff did report that his hands did not work as well as they used to. Verbally, he expressed himself coherently, but he was somatically preoccupied. He tended to go off on tangents and kept coming back to his physical problems, despite attempts to get information from him. There was no evidence of delusional thinking or paranoia. Emotionally, his affect was consistent with his thought content, and mood seemed euthymic. He did not describe persistent sadness but stated that he felt frustrated, at times hopeless, but never suicidal. Regarding anxiety, he was preoccupied with pain but did not describe persistent worry or any symptoms of OCD or panic. The anxiety he did have seemed to be primarily associated with his excessive somatic concerns. Results of cognitive measures were unremarkable. (Tr. at 338.)

Dr. Pushkash concluded that although there had been some question regarding anxiety and depression, plaintiff did not endorse sufficient symptoms to warrant those diagnoses. However, he met the diagnostic criteria for somatization disorder, which "create[d] significant

functional impairment." (Tr. at 339.)  Dr. Pushkash diagnosed somatization disorder, with a

GAF of 50, indicative of severe symptoms.[9]  Regarding his capability for work functions, Dr.

Pushkash wrote:

> The claimant has the intellectual capabilities to comprehend, recall, and follow
> through on instructions.  His ability to concentrate and persist on tasks was not
> seen to be significantly impaired during the present assessment.  It is likely that
> this man would be able to appropriately relate to supervisors and coworkers in
> a work environment as he was described as an individual who gets along well
> interpersonally.  Nonetheless, it appears that he has substantial difficulty coping
> with day-to-day pressure and stress because of his somatoform disorder.  Based
> on his assessment, it would appear that he could handle the money in his own
> best interest, if he is eligible for funding.

(Tr. at 339.)

On July 1, 2011, Pat Chan, M.D., evaluated petitioner's claim for the agency, finding no

severe physical impairment.  (Tr. at 341.)  On the same date, Eric Edelman, Ph.D., completed

a psychiatric review technique report, evaluating plaintiff under Listing 12.07 (somatoform

disorders).  (Tr. at 346.)  Under the functional criteria of that Listing, Dr. Edelman found mild

restriction of activities of daily living (adl's); mild difficulties in maintaining social functioning;

moderate difficulties in maintaining concentration, persistence, and pace ("cpp"); and no

episodes of decompensation.  (Tr. at 356.)  In an accompanying mental residual functional

capacity ("RFC") report, Dr. Edelman found moderate limitations in plaintiff's ability to complete

a normal workday with interruption from psychologically based symptoms, to perform at a

consistent pace without an unreasonable number and length of breaks, to accept instruction

---

[9] GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms
and his overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative
of a person with no symptoms, while a score of 1-10 reflects a person who presents a
persistent danger of hurting herself or others.  Scores of 51-60 reflect "moderate" symptoms
and 41-50 "severe" symptoms.  American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 32-34 (4th ed. 2000).

8

and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to set realistic goals and make plans independently of others. (Tr. at 342-43.) Dr. Edelman concluded that plaintiff was capable of sustaining unskilled work. In reaching his conclusion, Dr. Edelman relied on Dr. Pushkash's opinion, finding it consistent with the medical records. (Tr. at 344.)

On August 2, 2011, plaintiff went to the emergency department complaining of leg pain related to his varicose veins. (Tr. at 366-67.) Doctors ordered a right lower extremity venous doppler, which was negative. (Tr. at 364.)

On April 13, 2012, plaintiff went to the hospital complaining of headache lasting 36 days, which he likened to his head being in a vice. The pain was intermittently relieved by Ibuprofen, but with no long term relief. He also complained of forgetfulness, right sided mandibular pain, mid-sternal chest pain, nausea, blurred vision, chronic back pain, chronic frequent bowel movements, chronic right leg swelling secondary to varicose veins, and rhinorrhea secondary to seasonal allergies. (Tr. at 371.) On exam, he displayed normal range of motion, with no edema or tenderness, and normal mood and affect. (Tr. at 373.) After obtaining a head CT scan and lab work, Dr. Sara Northway suspected a benign cause of headache and discharged plaintiff home in stable condition with Fioricet.[10] (Tr. at 375-76, 383.)

## B.  Procedural History

### 1.  Plaintiff's Application and Supporting Materials

Plaintiff applied for benefits on November 1, 2010, alleging a disability onset date of December 1, 2009. (Tr. at 191.) He listed as impairments knee pain, diverticulitis,

---

[10]Fioricet contains a combination of acetaminophen, butalbital, and caffeine, and is used to treat tension headaches. http://www.drugs.com/fioricet.html.

degenerative joint disease of the knees, shoulders, and hands, and degenerative disc disease of the low back. (Tr. at 218.) He indicated that his past jobs had been very hard on his body, and that every body part he hurt in the past hurt now. He wrote that his knees hurt so badly it felt like some was pounding nails and glass into them. Walking up stairs or hills was so painful he could not take it. His back went out six to eight times per year, taking about 20 days to heal. His right ankle hurt, requiring him to wear a brace. Pain in his hands made it hard to cut food, handle money, and write. (Tr. at 222.)

In a function report, plaintiff provided a detailed description of a typical day, indicating that he woke up at about 1:00 a.m. because of pain in his knees or back, sometimes because of nightmares. From 1:00 a.m. to 4:00 a.m., he would read or watch TV until he could go back to sleep. During this time, he may have to use the bathroom two or three times. He would re-awake at 7:30 a.m., use the bathroom, shave, use the bathroom again, then shower, eat some fruit, and use the bathroom again. He would then try to take a walk. From 10:30 a.m. to 12:30 p.m., he would look for a job he might be able to do. From 12:30 to 1:00 p.m., he would do minimal house cleaning, and then eat a light lunch and use the bathroom. From 2:00 to 5:00 p.m., he could lay down and rest, followed by more housework from 5:00 to 5:30 p.m. From 5:30 to 7:00 p.m., he would prepare and eat dinner, then use the bathroom. From 7:00 to 9:30 p.m., he would watch TV, use the bathroom, then go to bed at 10:00 p.m. (Tr. at 232.)

Plaintiff wrote that he used to be able to work, play sports, run, attend events, plant flowers, and enjoy life, but the pain now made these things impossible to do. He indicated that it hurt to dress, that his shoulders cracked when he combed his hair, that it was hard to cut food due to pain in his hands, and that he used the toilet seven to twelve times per day. (Tr. at 233.) He made simple meals like sandwiches, frozen pizza, and soup. He was able to unload the

dish washer, do small loads of laundry, vacuum for 15 minutes, sweep for three minutes, and clean the bathroom for 10 minutes, but could not do outside chores like cut the grass or plant flowers. (Tr. at 234.) He shopped for food and clothing two to three times per month. (Tr. at 235.) He listed hobbies of watching TV, reading, and listening to music. He did not go out socially on a regular basis. (Tr. at 236.) He indicated that lifting over 10 pounds was painful, as was lifting above the shoulder. He could not squat or bend without pain. He could walk about 100 feet and climb eight stairs before he had to rest. He indicated that he could pay attention as long as needed, and followed written and spoken instructions very well. (Tr. at 237.) He stated that he had never been fired from a job because of problems getting along with other people. He indicated that he experienced an undue amount of stress in his life, including bad jobs, poor pay, divorce, single parenthood, assaults, and bad luck. He took acid reflux medicine because of an eroding esophagus. Asked how well he handled changes in routine, he wrote, "One must improvise in certain situations when need be." (Tr. at 238.) He indicated that he used a brace on his right ankle and used a cane to walk when one leg hurt more than the other or when his back went out. (Tr. at 238.) He reported that it hurt to stand for more than 20 minutes, and that if he sat for more than 20 minutes his knees would lock. He stated that it hurt to reach because of what felt like tears in the rotator cuff area. (Tr. at 239.)

In a physical activities addendum, plaintiff indicated that from the time he woke up until the time he went to bed he hurt. He felt like he played a game of football without pads or had been rolled down a hill in a barrel. (Tr. at 240.)

The SSA denied the application initially on January 21, 2011 (Tr. at 95, 107), relying on Dr. Khorshidi's opinion. Plaintiff requested reconsideration (Tr. at 116), but on July 5, 2011,

the SSA maintained the denial (Tr. at 104, 118), citing Dr. Chan's opinion. On July 27, 2011, plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. at 127.)

### 2. Hearing Testimony

On July 18, 2012, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a vocational expert ("VE"). (Tr. at 52-53.)

#### a. Plaintiff

Plaintiff testified that he was 53 years old, 5'11" tall, and 192 pounds. (Tr. at 56-57.) He indicated that he lived alone in an apartment, had no income, and relied on loans from family and friends. (Tr. at 57.) He graduated from high school in 1977. He had not worked since December 2009 when he was laid off after advising his employer he needed surgery on his testicle. (Tr. at 58.) Plaintiff testified that he still experienced pain in his testicle but had not received further treatment for it because he had no money or insurance. (Tr. at 59.) He indicated that he had not sought free or sliding scale treatment because he was not sure where to go and had no money for anything. (Tr. at 60.)

Plaintiff identified past work as a shipping clerk, warehouse worker, forklift driver, and delivery driver. (Tr. at 60-61.) He indicated that he could no longer work because he had to use the bathroom six to eight times per day; if he had to go somewhere, he usually carried wet wipes with him. (Tr. at 61-63.) He indicated that people sometimes kicked the stall door when he used a public restroom because he was in there so long. He further indicated that he woke up every morning in pain, which he compared to feeling like he played football without a helmet and pads. He identified pain in his knees, hands, shoulders, and right ankle. Asked if he reported this to his doctors, plaintiff indicated that he had no doctor, as he could not afford the

12

COBRA insurance payments after he was laid off. (Tr. at 64.) He was on the waiting list for Badger Care. (Tr. at 65.)

Asked about medications, plaintiff testified that he took Imodium for his diverticulitis and Omeprazole for acid reflux, both over the counter. He also took Alka Seltzer cold plus for hay fever; he said that he could not use Zyrtec because it may cause problems for his one remaining kidney. The Alka Seltzer helped but put him to sleep. (Tr. at 66.) He sometimes took Ibuprofen for swelling. (Tr. at 67.) He did not like to sit for too long, more than 15-20 minutes, or his knees would lock up. (Tr. at 67-68.) Lying down helped his pain better than sitting because of his knees. He testified that his memory was usually pretty good. Asked about attention, he indicated that he did not read as much as he used to because of his eyes, but he could follow a ½ hour television program. (Tr. at 68.) He further indicated that he was good with instructions, and he was pretty good at making decisions. He testified that his pain interfered with sleep, waking up after three or four hours. He also reported occasional nightmares since he was stabbed at the age of 21. (Tr. at 69.) He did household chores, but it took him a long time. He cooked things like hotdogs or brats. (Tr. at 70.) He did other chores around the house a little bit at a time. He did laundry, using buckets to drag his clothes down the stairs. (Tr. at 71.) He did grocery shopping with help carrying heavier items. (Tr. at 71-72.) He indicated that he could lift five to ten pounds, but not repeatedly. (Tr. at 72.) He denied outside activities like church, movies, or fishing. (Tr. at 72-73.) He occasionally went for a walk and recently tried riding a bike but couldn't do it because of pain. He used to go to sporting events but no longer did due to the stairs. (Tr. at 73.)

Plaintiff testified that he got 20 days of vacation and personal time per year at his last job but used them up within about five months due to pain-related absences. (Tr. at 74-75.)

13

Because of problems with his hands, he could no longer play darts, video games, or sports. (Tr. at 76.) He indicated that he had trouble writing and fumbled with and dropped things. (Tr. at 77.)

Plaintiff testified that he went to the emergency room on April 12, 2012, with a headache for 53 straight days. He thought it was a tumor, but it turned out to be an issue with a tooth, which was extracted.[11] (Tr. at 77.) Plaintiff also complained about chronic right lower extremity swelling due to varicose veins. (Tr. at 78.) He indicated that he had walked 16 blocks to Walgreen's for medication, and that his right leg swelled up and became painful. Doctors did a scan, diagnosing varicose veins and providing Ibuprofen for the swelling. (Tr. at 79.)

### b.    Vocational Expert

The VE classified plaintiff's past work as a delivery driver as medium, unskilled work; shipping and receiving clerk as medium, semi-skilled work; warehouse worker as medium, unskilled; and forklift driver as medium, semi-skilled. (Tr. at 85-86.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to light, low stress work. The VE testified that such a person could not perform plaintiff's past work (Tr. at 87) but could do other jobs, including mail clerk, office helper, and retail sales attendant (Tr. at 88-89). The ALJ asked a second hypothetical, assuming a person capable of light work, with the additional limitations of occasional kneeling, crouching, crawling, and climbing of ladders, ropes, or scaffolds, and mentally limited to no more than simple work-related decisions with no more than occasional changes in work processes. (Tr. at 89.) The VE said that such a person could not perform plaintiff's past jobs but could do other jobs,

_____

[11]The treatment note for this visit indicates, "There is no evidence of dental cause of his headache." (Tr. at 375.)

including mail clerk, office helper, and retail sales attendant (at reduced numbers). (Tr. at 90.) On questioning from plaintiff's counsel, the VE admitted that a person would be expected to normally cope with a certain amount of stress in these jobs. (Tr. at 91.)

**3.     ALJ's Decision**

On August 21, 2012, the ALJ issued an unfavorable decision. (Tr. at 19.) The ALJ concluded that plaintiff had not worked since December 1, 2009, the alleged onset date, and that he suffered from the severe impairments of pain complaints of undetermined etiology and somatoform disorder. The record contained references to various other ailments, including diverticulitis, an epididymal cyst, varicose veins, headaches, anxiety, depression, and PTSD, but the ALJ found them non-severe based on the absence of medical support in the record. (Tr. at 24-26.)

The ALJ found that none of plaintiff's impairments qualified as conclusively disabling under the Listings, specifically considering Listings 1.02 (knee), 1.04 (back), and 12.07 (somatoform disorders). As to Listing 12.07, the ALJ found mild restriction of adl's; mild difficulties in social functioning; moderate difficulties in cpp; and no episodes of decompensation.[12] (Tr. at 27.)

The ALJ then concluded that plaintiff retained the residual functional capacity ("RFC") for light work with only occasional kneeling, crouching, crawling, or climbing. The ALJ further found plaintiff capable of making simple work related decisions and performing work requiring no more than occasional changes in work processes. (Tr. at 28.) Based on this RFC and

---

[12]In order to meet a mental health Listing, the claimant must demonstrate at least two of the following: (1) marked restriction of adl's; (2) marked difficulties in maintaining social functioning, (3) marked deficiencies of cpp; or (4) repeated episodes of decompensation each of extended duration. See Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).

15

relying on the VE's testimony, the ALJ concluded that plaintiff could not perform his past work (Tr. at 32), but could do other jobs, such as mail clerk, office helper, and retail sales attendant. (Tr. at 33-34.)  The ALJ accordingly found plaintiff not disabled.  (Tr. at 34.)

On September 5, 2013, the Appeals Council denied plaintiff's request for review (Tr. at 1, 16), making the ALJ's decision the final word from the Commissioner on the application. See Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013).  This action followed.

## II.  DISCUSSION

The primary issue in this case is whether the ALJ properly evaluated plaintiff's alleged symptoms, including his severe pain and frequent need to use the bathroom.  In evaluating the credibility of a claimant's statements about his symptoms, agency rules require the ALJ to first determine whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms.  SSR 96-7p, 1996 WL 374186, at *2.  If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the symptoms, the symptoms cannot be found to affect his ability to work.  Id.  If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must then determine the extent to which the symptoms limit the claimant's ability to work.  Id.  For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record, including the claimant's daily activities; the duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and any other measures or treatment the claimant uses to

relieve the symptoms. Id. at *2-3. The ALJ may not reject the claimant's statements based solely on a lack of objective medical support. See, e.g., Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

The reviewing court will give "an ALJ's credibility determination special, but not unlimited, deference." Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012). The ALJ must consider the pertinent regulatory factors and then provide specific reasons for his credibility determination, supported by the evidence in the case record and articulated in the decision. See SSR 96-7p, 1996 WL 374186, at *4; Shauger, 675 F.3d at 696. The court need not defer to a credibility determination based on errors of fact or logic. Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006).

In this case, the ALJ first summarized plaintiff's testimony, including his claims of pain in various part of his body; his need to use the bathroom six to eight times per day; his trouble sleeping due to nightmares; and his difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing, completing tasks, and using his hands. (Tr. at 28.) The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 28.) This boilerplate passage is meaningless, as it fails to advise the court which statements were deemed (in)credible and why. See, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012). Worse, it gets things backwards, purporting to determine work capacity first, then comparing the claimant's statements to that finding, effectively "forcing the testimony

into a foregone conclusion." Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). The claimant's symptoms should instead be factored into the RFC assessment. See Bjornson, 671 F.3d at 645-46. Pain – even that of psychological origin – can be totally disabling, see Carradine, 360 F.3d at 754, making use of the boilerplate particularly pernicious in a case like this one.

The Seventh Circuit has held that use of the boilerplate can be harmless if the ALJ goes on to provide specific, cogent reasons for the credibility determination, e.g., Murphy v. Colvin, 759 F.3d 811, 816 (7th Cir. 2014), but the reasons provided in this case do not withstand scrutiny. The ALJ stated:

> The undersigned finds the claimant's allegations concerning the intensity, persistence, and limiting effects of his symptoms are less than fully credible. The allegations of the claimant are inconsistent with the objective medical evidence. As previously noted, the claimant was found to have a full range of movement in his hands, shoulder, his knees were without swelling or deformity, and he had negative straight leg raises. Additionally, despite his impairment, the claimant has engaged in somewhat normal level of daily activity and interaction. The claimant admitted activities of daily living including reading, watching television, preparing dinner, vacuuming, sweeping, using public transportation, shopping in stores, and spending time with others. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The undersigned finds the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.

(Tr. at 31, citations omitted.)

The ALJ made the same two errors that led to reversal in Carradine. First, he relied on the lack of objective medical support without appreciating that plaintiff's pain was of psychological origin and thus would not be verified by scans or physical exams. Carradine, 360 F.3d at 755; see also Palmer v. Sullivan, 770 F. Supp. 380, 385 (N.D. Ohio 1991). The ALJ also failed to acknowledge that, while plaintiff displayed normal range of motion during his exam with Dr. Hafeez, he screamed in pain when touched, when he bent his back, and when

18

he flexed his knees.  (Tr. at 331.)  Perhaps this was an act, but Dr. Pushkash's findings suggest not.

Second, the ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and [his] being able to work eight hours a day five consecutive days of the week."  Carradine, 360 F.3d at 755.  While SSR 96-7p directs the ALJ to consider a claimant's daily activities, "this must be done with care."  Roddy, 705 F.3d at 639.  A person has more flexibility in performing household chores than he would on the job; he can take frequent breaks; and he is not held to a minimum standard of performance, as he would be by an employer.  Bjornson, 671 F.3d at 647.  Here, the ALJ pulled a list of chores from plaintiff's written reports, without acknowledging plaintiff's statements at the hearing and in the reports that he did those tasks with significant limitations.  See Roddy, 705 F.3d at 639 ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time.").

For instance, plaintiff testified that he cooked dinner, but when asked for an example he mentioned putting hotdogs or brats on the grill.  (Tr. at 70.)  In his function report, he wrote that he made things like sandwiches, frozen pizza, and canned soup, which took 10 to 20 minutes.  He also wrote that he had a hard time cutting food because of pain in his hands.  (Tr. at 234.)  He wrote that he vacuumed for 15 minutes (Tr. at 234), and at the hearing he said that he cleaned house "a little bit at a time"  (Tr. at 71).  He testified that he went grocery shopping if someone gave him a ride (Tr. at 71) and helped him carry heavier items (Tr. at 72).  Overall,

plaintiff's testimony described a person who engaged in limited daily activities.[13]  (Tr. at 72-74.)
Moreover, while the ALJ noted plaintiff's statement that he had to use the bathroom six to eight
times per day for bowel movements (Tr. at 28, 61, 75), the ALJ never said whether he believed
that claim.  A person who needs to use the bathroom with such frequency may not be able to
maintain full-time work.[14]  See Edwards v. Colvin, No. 12 C 10071, 2013 WL 6098483, at *5
(N.D. Ill. Nov. 15, 2013).

The Commissioner attempts to distinguish Carradine, arguing that the Seventh Circuit
reversed in that case because the ALJ misunderstood the psychological nature of a
somatoform disorder and denied the claim based solely on a lack of objective medical
evidence.  But that is essentially what the ALJ did here.  He acknowledged plaintiff's
somatoform disorder but rejected plaintiff's pain complaints as inconsistent with the medical
record without considering whether the disorder could legitimately produce pain out of
proportion to the objective evidence.  The ALJ's misunderstanding is also reflected in the RFC
determination, which incorporated only mental limitations related to the somatoform disorder,
not physical ones.

---

[13]It is hard to see how reading and watching television, the other activities the ALJ
mentioned, translate to work.  See Mason v. Barnhart, 325 F. Supp. 2d 885, 904 (E.D. Wis.
2004).  Perhaps the ALJ cited these activities as evidence of plaintiff's ability to focus (see Tr.
at 68), but he did not say so in the decision. The ALJ also overlooked plaintiff's testimony that
he did not read as much as he used to because of issues with his eyes.  (Tr. at 68.)  The
Commissioner notes that the ALJ cited plaintiff's "somewhat normal level of daily activity" (Tr.
at 31, emphasis added) and did not equate those activities with an ability to work full-time.
However, the ALJ failed to explain why any of the listed activities undermined plaintiff's
credibility or how they related to specific work activities.  See Shafer v. Colvin, No. 13-C-15,
2014 WL 1785343, at *11 (E.D. Wis. May 5, 2014).

[14]The Commissioner notes that the ALJ found plaintiff's diverticulitis non-severe.
However, the ALJ must in determining RFC consider the combined effects of all impairments,
even those that are not severe in isolation.  See, e.g., Villano, 556 F.3d at 563.

The Commissioner notes that, unlike plaintiff, the claimant in <u>Carradine</u> had a lengthy treatment history. Earlier in his decision, the ALJ did note plaintiff's limited treatment:

> The claimant has not gone to physical therapy, received any injections, does not wear a back brace of any kind, and no surgery or indication for surgery is noted. This tends to show his symptoms and limitations are not as severe [as] he alleged.

(Tr. at 29.)

> Further, the undersigned notes that the claimant has not seen a psychiatrist, has not been hospitalized for psychiatric treatment, and does not receive any psychiatric treatment including medications or psychotherapy. This is inconsistent with the alleged severity of his symptoms and functional limitations and diminishes the credibility of his mental allegations.

(Tr. at 30.)

However, the problem with this observation is that agency rules prohibit an ALJ from drawing any inferences about a claimant's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that he may provide. SSR 96-7p, 1996 WL 374186, at *7. Here, plaintiff testified that he had no insurance (Tr. at 59); he could not afford the COBRA payments after he lost his job in December 2009 (Tr. at 64); he had no money to pay out of pocket (Tr. at 60); he was on the waiting list for Badger Care (Tr. at 65); and he did not know where to go to obtain free care (Tr. at 60). Inability to afford it is a good reason for not obtaining medical care.[15] <u>See, e.g.</u>, <u>Craft v. Astrue</u>, 539 F.3d 668, 679 (7th Cir. 2008). As for plaintiff's failure to seek psychiatric treatment, the ALJ failed to appreciate that an individual with a somatoform disorder believes his problems are physical rather than mental and thus would see no need to seek mental

---

[15]The Commissioner notes that at the hearing the ALJ questioned plaintiff about whether he sought free or sliding scale treatment. (Tr. at 60.) However, the ALJ did not in his decision consider the explanations plaintiff gave.

health care even if he could afford it. See Wright v. Astrue, No. CV-09-134, 2010 WL 2294533, at *10 (E.D. Wash. June 4, 2010); Palmer, 770 F. Supp. at 386; see also Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989) ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.").

The matter must be remanded for reconsideration of plaintiff's credibility. Relatedly, the ALJ must on remand reconsider his reliance on the consultants' reports and may wish to obtain further expert opinion on the effect of plaintiff's pain and other perceived symptoms on his ability to work. The ALJ relied primarily on Dr. Khorshidi's report in determining plaintiff's physical capacity (Tr. at 31), but Dr. Khorshidi did not have access to Dr. Pushkash's later psychological evaluation diagnosing plaintiff with a somatoform disorder.[16] Dr. Khorshidi found plaintiff's statements regarding his symptoms only "partially credible" because they were not supported by the medical evidence or Dr. Hafeez's examination. (Tr. at 99.) She did not factor the limiting effects of pain related to the somatoform disorder into her RFC for light work with some postural limitations. (Tr. at 100.) The ALJ gave great weight to Dr. Edelman's opinion that plaintiff could sustain unskilled work (Tr. at 31), but Dr. Edelman rendered no opinion on the physical effects of plaintiff's psychological impairment.[16] See Palmer, 770 F. Supp. at 387

_____

[16]Dr. Chan reviewed the file and prepared a physical RFC report after Dr. Pushkash's examination. However, the ALJ gave "little weight" to Dr. Chan's opinion. (Tr. at 31.) In any event, it does not appear that Dr. Chan considered the physical effects of plaintiff's somatoform disorder either. Dr. Chan cited Dr. Hafeez's exam and the absence of objective medical support in finding no severe physical impairment. (Tr. at 341.)

[16]The Commissioner contends that Dr. Edelman's report supports a conclusion that plaintiff could, despite his pain complaints related to the somatoform disorder, perform light work. Dr. Edelman did not endorse a light RFC.

(faulting ALJ for failing to ask the agency's medical expert about limitations pain placed on the ability of a claimant with somatoform disorder to engage in substantial gainful activity).

Finally, the ALJ must on remand reconsider plaintiff's stress- and cpp-related limitations. Dr. Pushkash found that plaintiff experienced "substantial difficulty coping with day-to-day pressure and stress because of his somatoform disorder." (Tr. at 339.) Relying on Dr. Pushkash's examination, Dr. Edelman found moderate limitations in plaintiff's ability to complete a normal workday with interruption from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instruction and respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to set realistic goals and make plans independently of others. (Tr. at 343.) Dr. Edelman further found moderate limitations in plaintiff's ability to maintain cpp. (Tr. at 356.) The ALJ said that he gave "great weight" to both reports, but his RFC for simple work-related decisions and occasional changes in the workplace (Tr. at 32) did not fully account for the limitations set forth above. See O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010); Stewart v. Astrue, 561 F.3d 679, 684-85 (7th Cir. 2009).[17] The Commissioner argues that the ALJ did not have to account for these limitations because Dr. Edelman translated them into an RFC for unskilled work. The ALJ did not rely on Dr. Edelman's translation in setting RFC, and even if he had the argument would fail for the reasons set forth in Olson v. Colvin, No. 13-C-15, 2014 WL 297305, at *4 (E.D. Wis. Jan. 27, 2014).

---

[17] The ALJ asked the VE a hypothetical including a limitation to "low stress work" (Tr. at 88), but he did not include that limitation in the RFC he later adopted or into the hypothetical question upon which he actually relied. (Tr. at 89.)

### III. CONCLUSION

Plaintiff seeks remand for an award of benefits or, in the alternative, rehearing under 42 U.S.C. § 405(g), sentence four. An award of benefits is appropriate only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the claimant qualifies for disability benefits. <u>Allord</u>, 631 F.3d at 416. The unresolved factual issues discussed above preclude a judicial award, so the matter must be remanded.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is remanded for further proceedings pursuant to § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 4th day of November, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge